UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 14 CR 110 |
| | ) | |
| BRANKO BOGDANOV, | ) | Judge Andrea R. Wood |
|   also known as "Franko Kalath" | ) | |
| MACA MOA, | ) | |
|   also known as "Lela Bogdanov" | ) | |

**GOVERNMENT'S POSITION PAPER
AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, hereby submits this position paper as to sentencing factors.

## I. Introduction

Defendants BRANKO BOGDANOV and MACA MOA are career criminals who, throughout their adult lives, have traveled across the country committing retail theft and related crimes. They have left behind a trail of convictions dating back to the 1970s, convictions which have not even remotely deterred either of them from a life of crime.

With personal backgrounds that are practically devoid of formal education or any verifiable legitimate employment, the defendants have repeatedly resorted to doing what they apparently know best: stealing and selling stolen goods. They raised and recruited at least one of their children into their lives of crime, who now is going to prison, in no small measure due to their influence and training. Neither

of them has expressed any genuine remorse for their actions, or given any other reason to believe that they will not fall back into a life a crime in the future.

For those reasons and others explained in more detail below, a substantial term of imprisonment is needed to promote respect for the law, to provide just punishment, to deter each defendant, and to protect the public from further crimes by them. The government recommends that the Court sentence each defendant to a 75-month term of imprisonment.

## II. Factual Background

### A. *The Criminal Offenses*

BOGDANOV and MOA stole large quantities of toys, electronics, and other kinds of merchandise from retailers throughout the United States. R. 1 at ¶¶ 4-48; R. 126 at 2-5; R. 128 at 2-4.[1] They typically would travel together, along with their daughter Julia, to shopping malls and large stores such as Toys R Us and Barnes & Noble. BOGDANOV and MOA picked out the goods they wanted to steal and then concealed the goods within the lining of a long skirt worn by MOA, while Julia kept a lookout for store employees and interfered with them if they attempted to question or detain BOGDANOV and MOA. R. 126 at 3; R. 128 at 3.

---

[1] The government shall use the citation "R." when referring to items filed electronically and made part of the official court record. For example, R. 1 refers to the criminal complaint and supporting affidavit; R. 126 refers to BOGDANOV's plea agreement; and R. 128 refers to MOA's plea agreement. The government shall refer to the probation officer's presentence investigation reports as "*Bogdanov PSR*" and "*Moa PSR*," respectively.

BOGDANOV and other family members quickly disposed of the stolen goods either by selling the goods online or by selling them directly to another person—referred to as "Individual A" or "the CI"[2]—with whom BOGDANOV had a long-term business relationship. R. 1 at ¶¶ 6, 9, 19-24; R. 126 at 3.

Over the course of ten years, between about 2003 and 2014, BOGDANOV sold millions of dollars in stolen goods to Individual A. R. 1 at ¶¶ 5, 6, 9; R. 126 at 3, 5. Individual A in turn sold the stolen goods on eBay (R. 126 at 3), at prices significantly below their retail value. R. 1 at ¶ 5.

**B.     *The Investigation***

Barnes & Noble and Toys R Us began investigating once they realized that they had sustained significant losses in certain kinds of merchandise, such as American Girl dolls, Furby robotic toys, Lego blocks, baby monitors, and baby carriers. R. 1 at ¶ 4. They discovered that similar items were being sold online, via Individual A's eBay account, in quantities similar to the quantities of the missing items. R. 1 at ¶¶ 4-5. From a review of eBay records, it appeared that Individual A had sold millions of dollars of goods through his eBay account. R. 1 at ¶ 5. eBay records also reflected that similar goods were sold through accounts maintained by BOGDANOV and/or several members of his family (Miso, Julia, and Sylvia Bogdanov). R. 1 at ¶¶ 19-23.

---

[2] The term "Individual A" is used in the indictment (R. 38 at 2-3, 5) and BOGDANOV's plea agreement (R. 126 at 3, 5), while "the CI" is used in the affidavit attached to the criminal complaint. R. 1 at ¶¶ 5-18.

In December 2013, a corporate investigator from Barnes & Noble traveled to Individual A's residence in suburban Chicago, where he interviewed Individual A. R. 1 at ¶ 6.[3] During that interview, Individual A acknowledged that over the course of the past ten years, he had purchased millions of dollars worth of merchandise from BOGDANOV, whom Individual A knew as "Franko Kalath." R. 1 at ¶ 6. Individual A subsequently verified this information when he was re-interviewed a month later, in January 2014, by an agent of the U.S. Secret Service. R. 1 at ¶ 9.

In support of his statements, Individual A provided the Secret Service agent with handwritten notes and receipts identifying goods that he had purchased from BOGDANOV in the past. R. 1 at ¶ 9. Individual A also provided the agent with access to his cell phone and email account, showing prior communications with BOGDANOV regarding the purchase and sale of various sorts of goods. R. 1 at ¶¶ 11-17. Individual A also relinquished custody of a stash of new toys and other goods in their original packaging, which Individual A said that he had purchased from BOGDANOV and which he was storing in his garage. R. 1 at ¶ 10.

The following month, February 2014, federal and local law enforcement officers began tracking BOGDANOV, MOA, and Julia as they traveled to stores in other states, apparently to steal goods. R. 1 at ¶¶ 33-46. Cellular telephone data placed BOGDANOV's cell phone in the vicinity of certain places in Oklahoma, Texas, Louisiana, and Mississippi. R. 1 at ¶¶ 32, 33, 37, 41. Meanwhile, police

_____

[3] The Barnes & Noble investigator will be available to testify at the sentencing hearing on May 13, 2016.

4

officers were able to physically locate the Bogdanovs and maintain surveillance of them as traveled together, in a van, to different stores and shopping malls in Texas, Louisiana, and Mississippi.  R. 1 at ¶¶ 33-46.

For instance, in Houston, Texas, police officers followed the Bogdanovs as they entered and exited certain stores, including a Toys R Us store.  R. 1 at ¶ 34.  A video surveillance camera within that Toys R Us store captured BOGDANOV and MOA handling Lego building blocks.  R. 1 at ¶ 34.  After the Bogdanovs departed the store, Houston police officers conducted a traffic stop.  R. 1 at ¶ 35.  During that traffic stop, the Bogdanovs turned over boxes of Lego building blocks for which they had no receipts, along with numerous other goods, including cosmetics, cutlery, bags of coffee, and FedEx packing materials.  R. 1 at ¶ 35.

The next day, a highway patrol officer in Mississippi conducted another traffic stop of the Bogdanovs' van, and observed several large trash bags in the back of the van.  R. 1 at ¶ 42.  When asked about the trash bags, BOGDANOV told the officer that the bags were full of goods that he had obtained from flea markets.  R. 1 at ¶ 44.  BOGDANOV displayed some of the items in the bags, which included Lego and Baby Bjorn brand names.  R. 1 at ¶ 46.  The officer allowed the Bogdanovs to continue on their way.  R. 1 at ¶ 46.

After returning home, BOGDANOV contacted Individual A.  R. 1 at ¶¶ 48-49. BOGDANOV sent photos to Individual A, via text message, depicting boxes of baby carriers, baby monitors, and Lego building blocks, in new condition and original

packaging. R. 1 at ¶ 48. Individual A in turn forwarded those photos to the Secret Service case agent. R. 1 at ¶ 48.

A week later, on March 4, 2014, the government filed a criminal complaint charging BOGDANOV, MOA, and Julia with violating 18 U.S.C. § 2314 (interstate transportation of stolen goods). R. 1. Magistrate Judge Michael T. Mason issued warrants for their arrest. R. 6, 7, 8. Magistrate Judge Mason also issued a warrant to search the Bogdanovs' residence.

Law enforcement officers subsequently arrested BOGDANOV, MOA, and Julia, and executed the search warrant. Among the items of evidence seized during the search were boxes of Legos, Barbie dolls, learning tablets, baby monitors, baby carriers, headphones, cosmetics, cutlery, silverware, and dozens of bags of Starbucks coffee. *See U.S. Secret Service Investigative Report*, reporting period 2/26/14-3/7/14 (Report #4, attached to the Government's Version) at 11-14.

## C.  *The Prosecution*

On April 2, 2014, within a month of the Bogdanovs' arrests, a grand jury returned a two-count indictment, charging them with conspiracy to violate § 2314 (Count One) and with a separate substantive violation of § 2314 (Count Two). R. 38. The indictment also alleged that the proceeds of the Bogdanovs' offenses were subject to forfeiture. R. 38 at 7.

BOGDANOV and MOA later pleaded guilty to both counts of the indictment on November 13, 2015. R. 126, 128. In their respective plea agreements, BOGDANOV and MOA acknowledged the elements of the offenses—in particular,

that they stole goods with a value in excess of $5,000 and that they transported the stolen goods across state lines—and that the conspiracy lasted more than ten years. R. 126 at 2-5; R. 128 at 2-4. However, they disputed the government's estimation of the loss amount and other potential sentencing enhancements. R. 126 at 7; R. 128 at 6-7.

To resolve the parties' dispute over the amount of the loss, this Court has scheduled an evidentiary hearing for May 13, 2016. The formal sentencings of BOGDANOV and MOA are scheduled for the following week, on May 18 and 20, respectively.

### III. <u>Sentencing Factors</u>

As a matter of procedure, the district court must correctly calculate the applicable sentencing guideline range, treat the guidelines as advisory, consider all of the § 3553(a) factors, select a sentence supported by the facts presented, and then adequately explain the selected sentence, including any variance from the guideline range. *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Annoreno*, 713 F.3d 352, 357 (7th Cir. 2013). "[A] major [variance] should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

Below is a discussion of the applicable sentencing guideline calculations and other pertinent sentencing factors as to each defendant.

### A. *Defendant BRANKO BOGDANOV*

BOGDANOV is facing a maximum fifteen-year term of imprisonment on the charges to which he has pleaded guilty (five years on Count One and ten years on

Count Two). *Bogdanov PSR*, at 20 ¶100. The advisory sentencing guideline range, as calculated by the probation officer, is 63-78 months of imprisonment. *Id.* at 20 ¶101. The government concurs with those guideline calculations. BOGDANOV does not.

### 1.    Sentencing Guideline Calculations

In his plea agreement, BOGDANOV disputed the government's offense level calculations, in particular, the government's calculation that (a) the base offense level should be increased by 18 levels because the amount of the loss exceeded $3.5 million; (b) the offense level should be increased by an additional two levels because the offenses involved ten or more victims; and (c) the offense level should be increased by two additional levels because BOGDANOV was in the business of selling stolen property. R. 126 at 7.

As explained below, each enhancement was correctly applied by the government, and then by the probation officer, in calculating BOGDANOV's sentencing guideline range.

### a.    Amount of the Loss

The government has the burden of proving the amount of the loss by a preponderance of the evidence. *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013). "That standard requires only that the fact-finder believe that the existence of a fact is more probable than its non-existence, and for the purposes of determining the loss amount, a reasonable estimate is sufficient." *Id.*; *see also* U.S.S.G. § 2B1.1, comment. (n.3(C)) ("[t]he court need only make a reasonable

8

estimate of the loss"); *United States v. Durham*, 766 F.3d 672, 686 (7th Cir. 2014) ("[a] district court need only make a reasonable estimate of the loss, not one rendered with scientific precision") (internal quotation marks omitted).

One of the reasons why courts are not required to determine the loss with mathematical precision is that the sentencing guidelines only require that the loss be within a certain range. *See* U.S.S.G. § 2B1.1(b)(1). The size of the gap between the low-end and the high-end of the range provides courts with some leeway in resolving disputes over the loss amount. *See United States v. Walsh*, 723 F.3d 802, 809 (7th Cir. 2013) ("[g]iven the broad range of the loss amount that yields the 20-level increase in offense level, 'there's . . . no need to determine with precision where within that span the loss falls'") (quoting *United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008)); *Caputo*, 517 F.3d at 943 ("[a] loss from $7 million through $20 million produces the same offense level; there's accordingly no need to determine with precision where within that span the loss falls").

In this case, the government estimates that the loss is within the range of $3,500,000-$9,500,000. U.S.S.G. § 2B1.1(b)(1)(J). More specifically, the government estimates that the loss is no less than $3,526,498. This loss amount was calculated in the following manner:

        i.    First, the dollar amounts of all of the items sold online by Individual A from 2007 to 2014—as reflected by the currently available eBay and

PayPal records—were added together, resulting in a total of approximately $2,271,209[4];

  ii. That total was then reduced by 10% (to $2,044,088) because Individual A estimated that 5%-10% of the items that he sold online were <u>not</u> obtained from BOGDANOV (*see U.S. Secret Service Investigative Report*, reporting period 12/19/13-1/21/14 (Report #1, attached to the Government's Version) at 6-7);

  iii. The total amount of items sold separately on eBay accounts maintained by members of BOGDANOV's family (approximately $777,110)—as reflected by eBay and PayPal records—was added to the above total, resulting in an adjusted total of approximately $2,821,198 ($2,044,088 + $777,110); and

  iv. That adjusted total was then increased by 25% to $3,526,498, to reflect the estimated total retail value of all suspected stolen items, which had been sold online at prices approximately 25% below their retail value. *See* U.S.S.G. § 2B1.1, comment. (n.3(C)(i)) (the court shall take into account "[t]he fair market value of the property unlawfully taken" or "the cost to the victim of replacing that property").[5]

---

[4] eBay and PayPal were unable to produce records for the entire ten-year period of the charged conspiracy, so the government considers this loss calculation to be conservative.

[5] Copies of the records supporting the above calculations have been placed in binders and will be separately produced to defense counsel and to the Court in advance of the evidentiary hearing. A private investigator from Barnes & Noble who compiled and reviewed the records will be available to testify at the hearing and answer questions about the above calculations.

Since the total amount of the estimated loss exceeds $3.5 million, the Court should increase BOGDANOV's base offense level by 18 levels pursuant to Guideline § 2B1.1(b)(1)(J).

### b.    Number of Victims

The sentencing guidelines provide for an additional enhancement based on the number of victims. "If the offense . . . involved 10 or more victims," then the offense level should be increased by two levels. U.S.S.G. § 2B1.1(b)(2)(A)(i). This two-level enhancement is applicable to this case.

BOGDANOV victimized countless retailers over the course of the ten-year conspiracy. Although the total number of victims and the identities of every victim are unknown, it is more likely than not that the offense involved at least ten victims.

BOGDANOV's plea agreement references three different Toys R Us stores in Texas and Louisiana from which he and MOA stole goods on February 19 and 20, 2014. R. 126 at 4. The affidavit attached to the criminal complaint identifies a host of other victim stores. R. 1 at ¶¶ 25-39.

BOGDANOV and his co-conspirators appear to have victimized more than ten retailers on one day alone, February 19, 2014. R. 1 at ¶¶ 33-36.[6] On separate days in 2013 and 2014, four Barnes & Noble stores in Maryland, Florida, Tennessee, and Oklahoma were victimized by them. R. 1 at ¶¶ 25-32.

---

[6] Toys R Us, Starbucks, FedEx, Apple, and Dillard's located in The Woodlands, Texas (R. 1 at ¶ 33) and The Baby Store, Wal-Mart, Apple, Sephora, Starbucks, and Toys R Us located in Houston, Texas (R. 1 at ¶ 34).

11

Considering that the conspiracy lasted more than ten years, resulting in millions of dollars in total losses, there is ample evidence to conclude that the offense involved ten or more victims. This Court should therefore increase BOGDANOV's offense level by two.

### c.    In the Business of Stolen Property

The guidelines provide for an additional two-level increase if (i) "the offense involved receiving stolen property" and (ii) "the defendant was a person in the business of receiving and selling stolen property." U.S.S.G. § 2B1.1(b)(4). Both prongs of this enhancement are satisfied here.

First, the offenses in this case clearly "involved receiving stolen property." The factual basis in BOGDANOV's plea agreement (R. 126 at 2-5), standing alone, resolves that issue.

As for the question of whether BOGDANOV was "in the business" of receiving and selling stolen property, there are several factors which the Court may consider in resolving that question, namely:

- the regularity and sophistication of the defendant's activities;

- the value and size of the inventory of stolen property maintained by the defendant;

- the extent to which the defendant's activities encouraged or facilitated other crimes; and

- the defendant's past activities involving stolen property.

U.S.S.G. § 2B1.1, comment. (n.5). At least some of those factors, if not all of them, justify the application of this 2-level guideline enhancement.

12

Although BOGDANOV's crimes were not particularly sophisticated, they were committed with regularity, over an extensive period of time—more than a decade—by BOGDANOV's own admission. R. 126 at 2, 5. BOGDANOV has further admitted that he sold goods to Individual A, which Individual A in turn sold on eBay. R. 126 at 3. eBay records, PayPal records, and other records provided by Individual A corroborate the extensive nature of their dealings. *See* R. 1 at ¶¶ 4-18.

Of course, BOGDANOV was not actually a licensed wholesaler or retailer of the sort of merchandise that was being sold on eBay; BOGDANOV claimed to the probation officer that he was in the business of selling Persian rugs and automobiles. *Bogdanov PSR*, at 17 ¶87. That claim is dubious, at best, because BOGDANOV did sell not cars or rugs to Individual A. The fact that BOGDANOV used a false name ("Franko Kalath") when dealing with Individual A (R. 1 at ¶¶ 6-17) underscores the illicit nature of their relationship.

BOGDANOV's criminal history, which consists of many arrests and convictions for theft and related crimes during the 1970s, 1980s, and 1990s (*Bogdanov PSR*, at 10-13), is further evidence that he was in the business of receiving and selling stolen property within the meaning of Guideline § 2B1.1(b)(4). BOGDANOV, a career thief, has earned this guideline enhancement.

13

2. **Other Sentencing Factors**

Before imposing sentence, courts are obligated to consider the following § 3553 sentencing factors in addition to the sentencing guidelines:

- the nature and circumstances of the offense (18 U.S.C. § 3553(a)(1));

- the history and characteristics of the defendant (*id*.);

- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (*id*. § 3553(a)(2)); and

- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (*id*. § 3553(a)(6)).

The sentencing factors most pertinent to this case—namely, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant—are addressed below.

a. **Nature and Seriousness of the Offense**

Any single act of retail theft, involving a small amount of merchandise and not involving violence or injury, would be considered a minor offense in and of itself. What transforms an otherwise mundane theft case into a serious federal offense is the repetitive, long-term nature of BOGDANOV's criminal activity, which resulted in millions of dollars of losses.

14

The widespread, interstate nature of BOGDANOV's criminal activity is an additional aggravating factor. By not focusing on any one jurisdiction, and instead moving quickly from state to state, BOGDANOV intentionally made it more difficult to investigate and prosecute him.

Prosecution at the local level would have been impractical and ineffective; previous local prosecutions were not successful in curbing BOGDANOV's criminal activities. Only through a collaborative effort by local and federal authorities, supplemented with electronic surveillance, was BOGDANOV able to be apprehended and appropriately charged in federal court here.

### b.    History and Characteristics of the Defendant

BOGDANOV was born in the former Yugoslavia. *Bogdanov PSR*, at 14 ¶63. He entered the United States in 1973 (*id*. at 15 ¶70) and began taking advantage of this country's freedoms to enrich himself and his family, not through education, hard work, or industriousness, but by stealing.[7]  Instead of contributing to society, BOGDANOV took from society, time and again.

BOGDANOV has been convicted seven times, at least once in almost every decade since the 1970s, in almost every part of the country, from the Midwest to the South, from East to West. *Id*. at 10-12.  He has been arrested an additional seven times in Illinois and other states for various offenses not resulting in conviction. *Id*. at 12-13.  Lenient sentences and the dismissal of charges have resulted in multiple

---

[7] BOGDANOV's first arrest, which was for possession of stolen property, took place in 1973 (*id* at 10 ¶45), the same year that he reportedly entered the country (*id*. at 15 ¶70), which he apparently did illegally.

opportunities for BOGDANOV to reform himself and become a contributing member of society. He has chosen not to do so.

BOGDANOV does not have a high school education. *Id*. at 3. Nor does he have a GED. *Id*. Perhaps BOGDANOV's limited education can be attributed, at least to some degree, to his family circumstances and upbringing. But there is nothing in the PSR to suggest that BOGDANOV has since taken any steps to educate himself and to obtain gainful employment, or that he ever had any interest in doing so.

BOGDANOV's claim that he earned $65,000-$80,000 in annual income from selling rugs and automobiles (*id*. at 17 ¶87) is unsubstantiated, and highly unlikely. It is more likely that most, if not all, of BOGDANOV's income came from illicit activities, considering the volume of retail goods sold online and to Individual A.

While BOGDANOV apparently has lived in this country for over forty years, he never became a U.S. citizen or a lawful permanent resident. *Id*. at 3. It is unknown whether BOGDANOV ever sought legal status. *See id*. at 15 ¶70. He appears to have no concern for the law.

### c. Promoting Respect for the Law, Just Punishment, and Deterrence

Promoting respect for the law is one of the fundamental objectives of sentencing. 18 U.S.C. § 3553(a)(2). It goes side-by-side with providing just punishment, affording adequate deterrence, and protecting the public from further

crimes. *Id.* All of those considerations are particularly relevant to this case, which involves a recidivist who traveled freely across the country to commit crime.

The most severe sentence received by BOGDANOV in any of his prior criminal cases was a seven-year term of imprisonment imposed by a Colorado court in 1992. *Bogdanov PSR*, at 12 ¶50. Undeterred by that sentence, BOGDANOV subsequently embarked on a decade-long crime spree leading to this federal case. BOGDANOV has not submitted any written explanation for his criminal conduct or verbally expressed any genuine remorse for his actions. *Id.* at 6 ¶12. The only explanation given so far has come from one of BOGDANOV's sons, who explained to the probation officer that BOGDANOV was motivated to steal in order to keep up with the property tax payments on their residence. *Id.* at 15 ¶69.

If that is the only explanation for BOGDANOV's offenses, then one can hardly feel confident that BOGDANOV will not commit another crime in the future. It would be one thing if BOGDANOV stole food to feed a starving family; it is quite another to steal huge quantities of unnecessary goods, for over a decade, for the supposed purpose of paying the property taxes on a large home in an affluent suburb. That is not a mitigating circumstance.

Given BOGDANOV's lack of remorse, his lack of education, and his lack of any source of legitimate income, there is little hope that he will not return to a life of crime when he gets out of jail. At this point, a lengthy jail sentence is the best and only way to try to deter BOGDANOV and to protect the retail community from further crimes by him. A sentence at the upper end of the sentencing guideline

17

range would honor those objectives, while providing just punishment for BOGDANOV's long-term criminal activity.

### 3.      Restitution and Forfeiture

In connection with any sentence imposed in this case, this Court should enter an order of restitution and an order of forfeiture.

With respect to restitution, the government proposes a restitution order in the amount of $134,027.21, of which $75,863.13 would be payable to Barnes & Noble and $58,164.08 would be payable to Toys R Us.[8] The amount of the proposed restitution order is less than the amount of the loss calculated for sentencing guideline purposes because the government is unable to link every piece of stolen merchandise to a specific victim retailer. Many of the items sold online during the period of the conspiracy were available for sale in multiple stores across the country and therefore could have been stolen from any one of a number of different stores. For example, Lego products were sold in numerous retailers across the country, so it is virtually impossible to trace all of the illicit online sales to specific victims.

Barnes & Noble and Toys R Us have estimated, to the extent possible, the minimal amounts of the losses that should be recoverable by them for restitution purposes. As to any other victims, the government does not currently have sufficient information to ascertain their losses with specificity.

---

[8] In advance of sentencing, the government shall tender a spreadsheet listing the victims' contact information.

Because BOGDANOV does not have sufficient liquid funds to satisfy the restitution order (*see Bogdanov PSR*, at 18), an order of forfeiture is appropriate. As part of his plea agreement, BOGDANOV has already acknowledged that his home in Northbrook is subject to forfeiture, and he has agreed to the entry of a forfeiture judgment. R. 126 at 12-13 ¶¶19-20. The government will separately file a motion for the entry of a preliminary order of forfeiture.

## B.   *Defendant MACA MOA (aka Lela Bogdanov)*

MOA's true legal name is uncertain, for she is not legally married to BOGDANOV (*Moa PSR*, at 13 ¶69) and she has used multiple names in the past. *Id.* at 3. Her true legal name could be Lela Konstantinov. *Id.* at 13 ¶66.

Like BOGDANOV, MOA does not have legal immigration status (*Moa PSR*, at 3), she is uneducated (*id.* at 16 ¶94), and she has no employment history. *Id.* at 17 ¶96. She reports no income, assets, or debts. *Id.*

MOA faces the same statutory penalties as BOGDANOV because she pleaded guilty to the same charges. MOA's sentencing guideline range, on the other hand, is higher than BOGDANOV's because her criminal history category is higher than his.[9] MOA's criminal record reflects ten separate convictions, from 1997 to 2003, from her teenage years to adulthood, for various theft-related offenses committed in Illinois and other parts of the country. *Id.* at 9-11. MOA, like BOGDANOV, was undeterred by any of her prior convictions and sentences.

---

[9] BOGDANOV is in criminal history category II (*Bogdanov PSR*, at 12 ¶51) and MOA is in criminal history category IV. *Moa PSR*, at 11 ¶58.

Having joined BOGDANOV in the ten-year crime spree leading to this federal case, MOA is now facing a sentencing guideline range of 84-105 months of imprisonment. *Moa PSR*, at 18 ¶98. The government recommends that the Court sentence MOA to the same term of imprisonment as BOGDANOV, 75 months, because her background and criminal history mirror BOGDANOV's in many respects and because she was equally instrumental in the long-term success of the conspiracy. BOGDANOV may have directed or instructed MOA to commit the crimes, but MOA is the one who physically concealed and carried away the stolen goods from victim retailers. Without MOA's assistance and skills, the conspiracy may not have succeeded, or succeeded for as long as it did.

All things considered, a 75-month term of imprisonment, nine months below the low end of MOA's sentencing guideline range, would be reasonable and fair—especially considering MOA's lengthy criminal record. Although MOA has experienced significant health problems (*Moa PSR*, at 14-15 ¶¶78-82), the Bureau of Prisons is equipped to handle her medical condition, as the probation officer has noted in his Sentencing Recommendation (at 2).

20

## IV. <u>Conclusion</u>

For the reasons set forth above, the government respectfully recommends that the Court sentence each defendant to a 60-month term of imprisonment on Count One of the indictment and a concurrent 75-month term of imprisonment on Count Two. The government further requests that the Court order each defendant to pay restitution in the amount of $134,027.21. With regard to defendant BRANKO BOGDANOV, the government additionally requests that the Court enter a preliminary order of forfeiture.

<div style="margin-left:40%;">

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

</div>

By:   */s/ Brian Havey*
BRIAN HAVEY
RENATO MARIOTTI
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300